IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

CASEY LEE JOHNSON,

        Plaintiff,

     v.                                                      No.  3:07-cv-1659-HZ

MAX WILLIAMS, BRIAN BELLEQUE,
MARK NOOTH, BRANDON KELLY,
ROBERT CAMPBELL, WILLIAM BELLMAN,          OPINION & ORDER
DRAYL RUTHVEN, REBECCA SAUER,
SHIRLEY HODGES, JOHN VARGO, in their
Individual and Official Capacities,

        Defendants.

Casey Lee Johnson
SID 12151379
Eastern Oregon Correctional Institution
2500 Westgate
Pendleton, Oregon 97801-9699

      Plaintiff Pro Se

/ / /

1 - OPINION & ORDER

John R. Kroger
ATTORNEY GENERAL
Jacqueline Kamins
ASSISTANT ATTORNEY GENERAL
Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096

      Attorney for Defendant

HERNANDEZ, District Judge:

      Plaintiff Casey Lee Johnson, an inmate in the custody of the Oregon Department of

Corrections (ODOC), brings this 42 U.S.C. § 1983 action raising claims regarding various

conditions of his confinement, confiscation of and discipline over certain mail, his request to

obtain a copy of "The Satanic Bible" and ODOC's failure to recognize "Satanism" as a religion,

and ODOC's deduction of various funds from his inmate trust account.  See Fourth Am. Compl.

(Dkt #56).  In a July 23, 2010 Opinion & Order, Judge King granted defendants' motion to

dismiss all claims except for the following:  (1) the claim regarding the mail; (2) the claim

regarding "The Satanic Bible" and Satanism; and (3) the claim regarding improper deductions

from the inmate trust account.  July 23, 2010 Op. & Ord. at pp. 7, 13 (Dkt #95).

      Defendants move for summary judgment on these remaining claims.  I grant the motion.

## STANDARDS

      Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  The

moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence

2 - OPINION & ORDER

of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting

Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine

issue of material fact, the burden then shifts to the nonmoving party to present "specific facts"

showing a "genuine issue for trial."  Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28

(9th Cir. 2009) (internal quotation omitted).  The nonmoving party must go beyond the pleadings

and designate facts showing an issue for trial.  Celotex, 477 U.S. at 322-23.

The substantive law governing a claim determines whether a fact is material.  Suever v.

Connell, 579 F.3d 1047, 1056 (9th Cir. 2009).  The court views inferences drawn from the facts

in the light most favorable to the nonmoving party and draws all reasonable inferences in that

party's favor.  Long v. City & County of Honolulu, 511 F.3d 901, 905 (9th Cir. 2007).

If the factual context makes the nonmoving party's claim as to the existence of a material

issue of fact implausible, that party must come forward with more persuasive evidence to support

his claim than would otherwise be necessary.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 587 (1986).

DISCUSSION

I.  The Mail Claim

In the Fourth Amended Complaint, plaintiff alleges that defendant Mark Nooth, whom

plaintiff identifies as the Superintendent of the Snake River Correctional Institution (SRCI),

violated plaintiff's First Amendment rights when he authorized his subordinate to suppress

plaintiff's expression for "National Socialism" by censoring his outgoing mail.  Fourth Am.

Compl. at pp. 2, 11.  Specifically, plaintiff alleges that in July 2008, he received a disciplinary

3 - OPINION & ORDER

violation for having drawn a swastika on a piece of mail.  Id.  He alleges that the swastika is a

symbol of a political movement, that he has a right to endorse political statements, and that a

swastika, which he describes as little or no different than a Star of David, cannot possibly impede

maintenance of institutional security.  Id.

      According to SRCI Correctional Sergeant Scott Webb, on July 22, 2008, Webb was

monitoring inmate mail and saw a large parcel that had been stamped by the United States Postal

Service as "ATTEMPTED NOT KNOWN," resulting in the package being returned to the

sender.  Webb Decl. at ¶ 6.  According to Webb, the parcel had been addressed to an inmate at

ODOC's Two Rivers Correctional Institution (TRCI).  Id.  The return address was plaintiff's.  Id.

      Under Oregon Administrative Rule (OAR) 291-131-0015, all incoming and outgoing

inmate mail is subject to inspection.  OAR 291-131-0015(6).  Webb inspected the parcel and

found a two-page letter and an inmate drawing.  Id.  The drawing contained multiple White

supremacist symbols, including (1) skulls interlaced with swastikas, (2) the numbers "88," which

Webb states represent "Heil Hitler," (3) "lightening bolts," which Webb states are "Schutstaffel,"

meaning an insignia associated with Hitler's "SS" paramilitary group; and (4) a pair of boots with

laces tied in parallel, which Webb states is a symbol of supremacist ideology.  Id.

      Webb describes the safety and security issues posed by these symbols:

>       The content of the drawing poses a threat to the safety and security of the
> facility because it serves as a rallying point for those inmates who adhere to the
> tenets of the White supremacist ideal.  The same symbol serves to incite other
> inmates who do not adhere to those ideals and encourage them to resist and
> disregard lawful orders of ODOC staff.  Symbols as diverse as a Nazi swastika
> and the Black power fist can serve to spur on and aggravate a tenuous and volatile
> situation.
>       Any symbol that represents a security threat group (or "gang"), has the
> potential to be inflammatory when viewed by inmates who belong to rival groups

or groups with opposing views. Inmates who are incarcerated for "their cause" are
often seen as martyrs and looked up to for advice and leadership. Possessing
White supremacist materials, like the drawing created by Inmate Johnson, is a way
to be identified as a member of a White supremacist security threat group.

Webb Decl. at ¶¶ 7, 8.

Webb confiscated the letter and drawing because of the security threat group content. <u>Id.</u>

at ¶ 9. He issued plaintiff a misconduct report for violation of "Inmate Rules of Prohibited

Conduct, Rule 4(o) (Unauthorized Organization II)." <u>Id.</u>

A disciplinary hearing on the misconduct report was held on July 31, 2008. Att. 2 to

Webb Decl. at pp. 1-2. In the Findings of Fact, Conclusions, and Order signed by the hearings

officer on August 1, 2008, the hearings officer found that Webb discovered a drawing that

plaintiff had attempted to mail out of the institution, which included skulls with swastikas, the

number "88" for Heil Hitler, lightning bolts for Schutstaffel, and a pair of boots with paralleled

laces, symbolic of skinhead ideology. <u>Id.</u> The hearings officer further found that plaintiff

possessed the drawing prior to attempting to mail it out of the institution. <u>Id.</u> The hearings

officer determined that plaintiff

> supported, displayed, or endorsed through verbal, visual, or written
> communication, any club, association or organization which is a Security Threat
> Group or engaged in a petition drive without specific authorization from the
> functional unit manager, except as specified by OAR 291-245 or by the institution
> Security Threat Group manager, thereby violating Rule 4o, Unauthorized
> Organization II.

<u>Id.</u> Plaintiff was fined $75 for the rule violation. <u>Id.</u> at p. 2.

Defendants argue that they did not violate plaintiff's First Amendment rights in

sanctioning him for sending a letter containing numerous gang-related symbols, to another

inmate. They argue that the correct standard is one used to evaluate restrictions on incoming

mail and the actions taken in this case were validly related to legitimate penological interests. They contend that when the state's interests in efficiently operating its prisons are balanced against plaintiff's constitutionally protected First Amendment rights, the state's interests prevail.

In response, plaintiff contends in his memorandum that the mail he sent was addressed to a person named Billy Brosowske who was an ex-inmate, having been paroled to the "Sponsors" halfway house in Eugene, Oregon. Pltf Mem. at p. 3. In a July 27, 2008 ODOC "Inmate Communication" sent regarding the misconduct report, plaintiff concedes that the drawing contained skulls interlaced with swastikas, but he asserts that the swastika is a symbol of a political movement and National Socialism which does not threaten the safety, security, or orderly operation of the prison. Att. 3 to Pltf Mem.

I agree with defendants that they did not violate plaintiff's First Amendment rights by confiscating the drawing and disciplining plaintiff for possessing and mailing it. Even though plaintiff mailed the drawing out of SRCI, I consider the document to be "incoming" mail. First, the mail was actually confiscated upon being returned to SRCI, that is, coming into SRCI, and as such, it is properly viewed as "incoming" mail. Second, Webb's statement that the mail sent by plaintiff was addressed to an inmate at Two Rivers Correctional Institution is not contradicted by a sworn statement by plaintiff. Thus, while sent out of SRCI by plaintiff, the mail was intended to be "incoming" to another inmate at a different institution. Third, even if I credit plaintiff's unsworn statement, contained in his memorandum, that the mail was sent to an ex-inmate at a halfway house, I nonetheless consider the mail to be "incoming" because such an inmate is still under the control of ODOC and thus, mail sent to him may be properly considered to be

"incoming" to the other institution, or in this case, the halfway house.[1]

Prisoners have a First Amendment right to send and receive mail.  Witherow v. Paff, 52

F.3d 264, 265 (9th Cir. 1995) (per curiam) (citing Thornburgh v. Abbott, 490 U.S. 401, 407

(1989)).

> However, a prison may adopt regulations which impinge on an inmate's
> constitutional rights if those regulations are "reasonably related to legitimate
> penological interests."  Turner v. Safley, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261,
> 96 L. Ed. 2d 64 (1987).  Legitimate penological interests include "security, order,
> and rehabilitation."  Procunier v. Martinez, 416 U.S. 396, 413, 94 S. Ct. 1800,
> 1811, 40 L. Ed. 2d 224 (1974).

Id.

The Turner analysis establishes four factors used to evaluate the challenged restriction:

(1)  whether there is a "valid, rational connection between the prison regulation and the

legitimate governmental interest put forward to justify it"; (2) whether there are alternative

avenues that remain open to the inmate to exercise the right; (3) the impact that accommodating

the asserted right will have on guards and other prisoners, and on the allocation of prison

resources; and (4) whether the existence of easy and obvious alternatives indicates that the

regulation is an exaggerated response by prison officials.  Turner, 482 U.S. at 89-90 (internal

quotation omitted).

Turner's first factor is satisfied because there is a common-sense connection between the

prison's regulations and the objective of prohibiting mail associated with Security Threat Groups

---

[1]  At least one court has concluded that confiscation of a prisoner's outgoing mail which
contained swastikas and referred to the Ku Klux Klan was not unconstitutional because it
furthered the legitimate, penological goal of inmate rehabilitation.  Koutnik v. Brown,
456 F.3d 777, 785 (7th Cir. 2006).

in general and White supremacist groups in particular, from entering or leaving the prison.  See

Prison Legal News v. Cook, 238 F.3d 1145, 1150 (9th Cir. 2001)  ("[W]hen the inmate does not

present enough evidence to refute a common-sense connection between a prison regulation and

the [asserted] objective . . . Turner's first prong is satisfied") (internal quotation omitted).  Here,

Webb's uncontradicted testimony is that White supremacist symbols serve as a rallying point for

those inmates who adhere to the tenets of the White supremacist ideal and further serve to incite

other inmates who do not adhere to those ideals.  He indicates that such symbols have the

potential to be seen as inflammatory by those inmates who belong to rival groups or groups with

opposing views.  Incoming mail "reasonably may be expected to circulate among prisoners, with

the concomitant potential for coordinated disruptive conduct."  Thornburgh, 490 U.S. at 412.

Next, the relevant inquiry under the second Turner prong is "whether the inmates were

deprived of all means of expression  . . . [or] retain the ability to participate in [other means]."

O'Lone v. Estate of Shabazz, 482 U.S. 342, 352 (1987) (internal quotation omitted).  Here,

plaintiff retains his right to engage in free expression regarding political matters, political beliefs,

or political parties as long as that speech does not contain threatening or inflammatory

communications.

Third, the court examines whether accommodation of the right will have an adverse

impact on guards, other inmates, and prison resources generally.  As with the first Turner factor,

it is common sense that enabling inmates to receive gang-related material has an enormous

impact on guards and other inmates.  Again, as Webb explains, material associated with Security

Threat Groups poses the threat of inciting gang violence in the prison environment.  No further

explanation is required to conclude that accommodating plaintiff's rights in this instance would

8 - OPINION & ORDER

adversely impact the prison as a whole.

As to the fourth <u>Turner</u> factor, at present, prison officials restrict incoming Security Threat Group-related material.  Other than allowing such material into the institution, there are no readily available alternatives to this practice.  While plaintiff contends that the swastika is the same as a Star of David and attaches information from "about.com" suggesting that the swastika is an "archetypal, universal human religious symbol," Att. 2 to Pltf Mem., plaintiff fails to contradict Webb's sworn statements that the drawing contained White supremacist symbols other than swastikas.  Additionally, as explained by the District of Colorado,

> [w]hile the swastika is an ancient symbol of the Greek cross, it is not included in the definition of  "cross" and unlike the typical cross, is a recognized symbol of anti-Semitism and Naziism. <u>See</u> <u>Webster's New Collegiate Dictionary</u> (1977) at 271, 1176; <u>The New Encyclopedia Britannica</u>, Vol. 11 at 433 (15th Ed.1994); <u>Texas v. Johnson</u>, 491 U.S. 397, 436 (1989) ("The message conveyed by some flags—the swastika, for example—may survive long after it has outlived its usefulness as a symbol of regimented unity in a particular nation.").

<u>Rooks v. Zavares</u>, No. Civ. A. 99-B-631, 2001 WL 34047959, at *11 (D. Colo. Jan. 25, 2001) (concluding that confiscation of swastika medallion was constitutionally permitted under <u>Turner</u> because "[g]iven the recognizable and inflammatory meaning of the swastika," there was a "'valid, rational connection' between the confiscation of the medallion and the 'legitimate government interest' of security within the prison"; there was no evidence that religious medallions or symbols of all kinds were banned from the facility, and thus there was no evidence that there were not "alternative means of exercising the right"; "the impact of inmates openly wearing anti-Semitic symbols would be great, as the possibility of violence would rise" and the plaintiff provided no evidence that "obvious, easy alternatives" to the seizure existed).  Thus, even if the drawing contained only swastikas with skulls as plaintiff concedes, such symbols are

presently so closely related to the White supremacist movement that the drawing can be described as threatening to certain populations within the prison.

The judgment of correctional officials is due deference, especially when plaintiff provides no contrary evidence. See Pell v. Procunier, 417 U.S. 817, 827 (1974) (judgment of correctional officials in security matters is "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters"). Here, plaintiff provides only unsupported, conclusory statements about the effect of swastikas and other White supremacist symbols upon the prison population. The evidence of the prison officials is therefore uncontradicted.

Based on the four Tuner factors, defendants did not violate plaintiff's First Amendment rights by confiscating the mail at issue.[2] I grant defendants' motion on this claim.

II. The Satanic Bible and Satanism Claim

In his Fourth Amended Complaint, plaintiff contends that defendants have denied his right to practice "Satanism." Fourth Am. Compl. at p. 11. He alleges that ODOC refuses to recognize Satanism as a mainstream religion and that it refuses to allow The Satanic Bible by Anton LaVey and publications written by The Church of Satan into ODOC institutions. Id. at p. 12. Plaintiff contends that these ODOC actions violate the First Amendment's Establishment

---

[2] It is unclear if plaintiff's claim is based on the confiscation of the drawing upon its discovery in the incoming mail, or on the discipline he received for possessing the material. The allegations in the Fourth Amended Complaint and in his briefing suggest it is the former. However, even if plaintiff contends that the constitutional violation occurred with the imposition of discipline for possessing the material, the Turner analysis, which is used to assess the constitutionality of prison regulations of all kinds, not just those concerning mail, still applies and the result would be the same.

Clause and the Religious Land Use and Institutionalized Persons Act.  Id.

In his memorandum filed in opposition to defendants' motion for summary judgment[3],
plaintiff argues that he has a constitutional right under the First Amendment to the free exercise
of non-mainstream religions such as Satanism, Wicca Asatru, and the Church of Jesus Christ
Christians.  Pltf's Resp. Mem. at p. 5.   As I understand plaintiff's claims, he contends both that
ODOC's failure to recognize Satanism as a religion violates the Establishment Clause, and that
ODOC's prohibition on certain material associated with Satanism or certain other religions,
violates his right to freely exercise his religion.  Additionally, he contends that one or both of
these acts by ODOC violates his statutory rights under the Religious Land Use and
Institutionalized Persons Act,  42 U.S.C. § 2000cc-1 (RLUIPA).

I grant defendants' motion on the Establishment Clause claim and on the RLUIPA claim
to the extent it is based on plaintiff's assertion that defendants have failed to recognize Satanism
as a religion.  While Establishment Clause cases "have often stated the principle that the First
Amendment forbids an official purpose to disapprove of a particular religion or of religion in
general," Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532 (1992),
the uncontradicted evidence in the record in this case shows that ODOC has not "refused to
recognize Satanism."

In a June 10, 2008 Inmate Communication, plaintiff complained that he had been refused
religious material because ODOC claimed that Satanism is not a recognized religion.  Att 2 to

---

[3]  Plaintiff entitled his response memorandum as a "Memorandum in Support of Motion
for Summary Judgment." (Dkt #126).  However, plaintiff did not file a motion and does not make
an argument that he is entitled to summary judgment.  Thus, I construe the filing as a
Memorandum in Response to Defendants' Motion for Summary Judgment.

Gary Sims Decl. at p. 1.  In response, plaintiff received a letter dated June 13, 2008, from Tom

O'Connor, then-Administrator of Religious Services for ODOC.  Att. 3 to Sims Decl.  There,

O'Connor explained that ODOC "does not 'recognize' particular religions in that sense [of] the

term."  Id.  He stated as follows:

> Sometimes inmates request that the Oregon Department of Corrections "recognize
> Satanism as a religion".  The Department, however, does not "recognize"
> particular religions in that sense [of] the term.  There are thousands of religions
> and beliefs systems in the world and we would never be able to keep up an
> accurate list of recognized religions.  I understand, however, that some people
> consider Satanism to be their religion.  Other people consider Satanism to be their
> set of guiding beliefs or philosophy about life.  You are free to believe and follow
> your understanding of Satanism provided you do so in a way that is appropriate to
> a prison situation and is consistent with Department rules and facility procedures.
> Your following of Satanism, therefore, cannot undermine the Department's ability
> to operate prisons that are safe and secure and that promote good order,
> rehabilitation and pro social behavior among those incarcerated.

Id.

Plaintiff fails to offer any evidence creating an issue of fact regarding ODOC's policy of

not "recognizing" one religion over another.[4]  Therefore, plaintiff's Establishment Clause claim

and any analogous RLUIPA claim, are not sustained and summary judgment is granted to

defendants on this claim.

In the same June 10, 2008 Inmate Communication, plaintiff requested a copy of <u>The</u>

---

[4] Plaintiff filed hundreds of pages of documents in opposition to defendants' summary judgment motion.  <u>See</u> Docket #118-122, 127; <u>see also</u> Docket #126 (response memorandum with three exhibits attached).  Although his response memorandum fails to specifically cite to any of the exhibits other than to the three attached to his memorandum, I have attempted to review them all, even though I am not obligated to do so.  <u>See</u> <u>see also</u> <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237 F.3d 1026, 1029 (9th Cir. 2001) (a district court is not required to comb the record to find some reason to deny a motion for summary judgment) (internal quotation omitted); <u>Tallacus v. Sebelius</u>, No. CV-08-591-AC, 2010 WL 1525562, at *4 (D. Or. Apr. 15, 2010) (court has no independent duty to search the record outside of those citations provided by the party in the concise statement).

Satanic Bible by Anton LaVey.  Att. 2 to Sims Decl.  In his response, O'Connor told plaintiff that

the book was currently prohibited because of security concerns.  Att. 3 to Sims Decl.  O'Connor

indicated that ODOC was reviewing its current policies about the book and that ultimately,

ODOC's "policy team" would make a determination, taking religious, security, mailroom, and

other concerns into account.  Id.

On July 1, 2008, plaintiff wrote another Inmate Communication requesting "religious

material on Satanism and the Santanic [sic] Bible written by Anton LeVey."  Att. 4 to Sims Decl.

O'Connor responded to this request on July 21, 2008, stating that plaintiff should re-read

O'Connor's June 13, 2008 letter and indicating that in case plaintiff had not received the letter,

O'Connor would send him another copy.  Id.  O'Connor also informed plaintiff that he did not

believe that the institution library had any material on Satanism.  Id.  However, he urged plaintiff

to check with the institution's chaplain because there may in fact be books on Satanism in the

chapel library.  Id.

In his Declaration, Gary Sims, ODOC's present Administrator of Religious Services,

explains that The Satanic Bible by Anton LeVey is not authorized in ODOC facilities.  Sims

Decl. at ¶ 11.  He notes that following the review referred to by O'Connor in his June 2008 letter

to plaintiff, a decision was made that The Satanic Bible would not be allowed into ODOC

correctional facilities for safety and security reasons.  Id.  Sims also explains that as to other

Satanic "material," plaintiff is free to request whichever material he desires through a Religious

Accommodation Request.  Id. at ¶ 19.  Such requests are evaluated on a case-by-case basis and

material that does not specifically incite violence or pose other security concerns may be

admitted into the institution.  Id.

13 - OPINION & ORDER

Based on the record in the case, I consider plaintiff's free exercise claim to be based on the denial of his request to possess a copy of The Satanic Bible. Plaintiff's requests for other "material" or "literature" on Satanism are too vague to state a claim. The unrebutted evidence in the record is that plaintiff is free to request any specific religious material he desires and such requests will be considered on a case-by-case basis. Thus, the alleged infringement on his First Amendment religious exercise rights, and the alleged violation of the RLUIPA, is limited to the denial of his request for The Satanic Bible.

A. The Satanic Bible

Sims explains that The Satanic Bible is prohibited in ODOC facilities because it promotes behavior that is a threat to the safety and security of staff and inmates. Sims Decl. at ¶ 10. He states:

> A Satanist is advised by the *Satanic* bible to perform any act according to his desire. If this fulfilled desire or act is challenged by authorities, then the Satanist is told he is entitled to his choice or pleasure and that there should be no restraint on the part of the authorities. The Satanist is encouraged to follow personal temptation even if the fulfillment of that temptation conflicts with authorities. Furthermore, the Satanist is informed that the authorities are wrong and have no right to restrain the Satanist's desire. This means it is sanctioned for the Satanist to steal someone else's property, take another person to fulfill personal lust, or destroy any person who has wronged the Satanist.

Id.

According to Sims, teachings of The Satanic Bible include the following: (1) antagonism to anyone who believes differently than the Satanist; (2) defiance of authority, whether secular, institutional, or religious; (3) casting of spells and magic, including the seeking of physical, mental, and emotional destruction of the victim; (4) total disregard for the lives and well being of others with the value of other humans found only in the contribution which that individual can

make to the indulgence of the Satanist; and (5) advocacy and incitement of acts of violence,

including human sacrifice, on anyone the practitioner believes has acted unacceptably.  Id. at ¶¶

13-16.

Sims states that The Satanic Bible's explicit incitement of violence can be extremely

dangerous to the safety of staff and inmates.  Id. at ¶ 16.  He notes that indulgence and fulfilling

selfish desire are the ultimate goals of the Satanist.  Id. at ¶ 17.  The required practice of spells

and magic violates ODOC policy of one offender exercising authority and control over another

offender.  Id.  Further, the "basic precepts of faith and the ritualistic worship as advocated by

Satanists may potentially create an environment of violence in a correctional facility.  Id.  As

such, "the beliefs, teachings and practices of *Satanism* are contrary to the rehabilitative mission

of ODOC."  Id.

Other courts have recognized that "much of the [Satanic Bible] advocates preying on the

weak in any way possible for one's own gratification[.]"  Carpenter v. Wilkinson, 946 F. Supp.

522, 529 (N.D. Ohio 1996) (quoting extensively from the text of The Satanic Bible); see also

McCorkle v. Johnson, 881 F.2d 993, 995-96 (11th Cir. 1989) ("LaVey states that right and wrong

have been inverted too long" and "declares that hatred of ones [sic] enemies is of utmost

importance; revenge should be a top priority"); Winford v. Frank, No. 06-C-1000, 2008 WL

359728, at *3  (E.D. Wis. Feb. 8, 2008) ("*The Satanic Bible*, by Anton Szandor LaVey preaches

self-indulgence, self-gratification and vengeance . . . [and] also advocates that the weak are here

to serve the strong, that believers should rebel against the laws of man and hate authority, and

that bodily impulses are to be pursued regardless of the consequences"); Burton v. Frank, No. 03-

C-0374, 2004 WL 1176171, at *4 (W.D. Wis. May 20, 2004) (The Satanic Bible "advocates the

15 - OPINION & ORDER

murder of 'totally obnoxious and deserving individuals,' exaction of vengeance through violence, mutilation and murder of anyone a Satanist believes to be his enemy and annihilation of the 'festering fragments of the body of he who would detain me[,]'" and "challenges its readers to rebel against the law of man and engage in symbolic acts of violence against one's enemies") (quoting The Satanic Bible).

B.  First Amendment Free Exercise Claim

"Inmates retain the protections afforded by the First Amendment, 'including its directive that no law shall prohibit the free exercise of religion.'"  Shakur v. Schriro, 514 F.3d 878, 883-84 (9th Cir. 2008)  (quoting O'Lone, 482 U.S. at 348).  However, prisoners' constitutional rights are subject to substantial limitations and restrictions in order to allow prison officials to achieve legitimate correctional goals and maintain institutional security.  O'Lone, 482 U.S. at 348.

Similar to plaintiff's claim regarding his First Amendment speech rights discussed above, the four-factor test from Turner applies in the context of a claimed burden on a prisoner's right to the free exercise of religion.  Alvarez v. Hill, 518 F.3d 1152, 1156 (9th Cir. 2008) ("Turner[] . . . governs inmate free exercise claims brought under the First Amendment").[5]

The undisputed evidence in this record is that The Satanic Bible could have the effect of advocating violence, criminal activity, and defiance of authority.  Sims's characterization of the publication is uncontradicted and is supported by the findings of other courts around the country. Defendants' conclusions regarding the dangers posed by this material are entitled to deference.

_____

[5]  Additionally, for the purposes of this motion, I assume without deciding that plaintiff's belief in Satanism is sincerely held and it is "rooted in religious belief," rather than in secular philosophical concerns.  Shakur, 514 F.3d at 884.

16 - OPINION & ORDER

E.g., Pell, 417 U.S. at 827. As a result, Turner's first factor is satisfied because there is a rational connection between the restriction and the legitimate governmental interest justifying the restriction. See, e.g., Doty v. Lewis, 995 F. Supp. 1081, 1086-87 (D. Ariz. 1998) (because "a prison creates a haven for the strong to harm, imperil and manipulate the lives of the weak," The Satanic Bible, which "advocates hurting someone who, in the opinion of the Satanist, deserves to be harmed and destroyed," creates a danger to the safety of the prison; prisoner failed to demonstrate that ban on The Satanic Bible was not reasonably related to legitimate penological interests).

Because ODOC does not ban religions but only regulates the way in which a religion may be practiced, plaintiff is free to engage in other practice methods including meditating and praying in regard to his beliefs. As noted above, he may also request other books or accommodations that are not inconsistent with the prison's prohibitions.

The adverse impact of admitting the book into the prison population is well articulated by Sims. It goes without saying that the book's authorization of violence and defiance of authority could negatively impact prison staff and other inmates. E.g., Burton, 2004 WL 1176171, at *5 (finding third Turner factor satisfied when, deferring to the opinions of prison administrators, court concluded that inmates would be more likely to behave in ways that would adversely affect other inmates, such as engaging in strong-arming and physical abuse, after reading The Satanic Bible, and would also create more work for guards, disciplinary staff, and health services workers).

On the fourth Turner factor, plaintiff fails to identify any alternatives that would not compromise the prison's interest in security and safety. Where there are no obvious alternatives

that would protect against disruptions to the peaceful and effective administration of the prison, it is less likely that the restriction is an exaggerated response by prison officials.  Turner, 482 U.S. at 90.

Balancing the four factors, I conclude that defendants' prohibition on plaintiff's receiving The Satanic Bible is reasonably related to ODOC's legitimate interests in security and safety.  I grant defendants' motion on the free exercise claim.

C.  RLUIPA Claim

To state a claim under RLUIPA, a plaintiff must show that "a government" has "imposed a substantial burden on his religious exercise."  Florer v. Congregation Pidyon Shevuyim, N .A., 639 F.3d 916, 921 (9th Cir. 2011).  Under RLUIPA, a plaintiff bears the initial burden of setting forth a prima facie claim that the "policy and its punitive sanctions designed to coerce him to comply with that policy constitute a substantial burden on the exercise his religious beliefs." Warsoldier v. Woodford, 418 F.3d 989, 994 (9th Cir. 2005).  Once the initial burden is met, the burden shifts to defendants to show that any substantial burden on plaintiff's "exercise of his religious beliefs is both 'in furtherance of a compelling governmental interest' and the 'least restrictive means of furthering that compelling governmental interest.'"  Warsoldier, 418 F.3d at 995 (quoting 42 U.S.C § 2000cc–1(a); § 2000cc–2(b)).  RLUIPA is to be broadly construed in favor of protecting the inmate's right to exercise his religious beliefs.  Id.

Defendants argue that even assuming that plaintiff is a sincere practitioner of Satanism and that the exclusion of The Satanic Bible amounts to a substantial burden on his religious exercise, defendants are nonetheless entitled to summary judgment on the RLUIPA claim because prohibiting The Satanic Bible is the least restrictive means to achieve a compelling

18 - OPINION & ORDER

governmental interest.  I agree with defendants.[6]

A 2005 Supreme Court decision indicates that similar to First Amendment claims

challenging prison regulations, courts analyzing claims under RLUIPA are to give deference to

prison officials' expertise regarding prison safety and security:

> We do not read RLUIPA to elevate accommodation of religious
> observances over an institution's need to maintain order and safety.  Our decisions
> indicate that an accommodation must be measured so that it does not override
> other significant interests.  In [Estate of Thornton v.] Caldor, [Inc, 472 U.S. 703
> (1985)], the Court struck down a Connecticut law that "arm[ed] Sabbath observers
> with an absolute and unqualified right not to work on whatever day they
> designate[d] as their Sabbath."  472 U.S., at 709, 105 S. Ct. 2914.  We held the
> law invalid under the Establishment Clause because it "unyielding[ly] weigh[ted]"
> the interests of Sabbatarians "over all other interests."  Id., at 710,105 S. Ct. 2914.
>
> We have no cause to believe that RLUIPA would not be applied in an
> appropriately balanced way, with particular sensitivity to security concerns.
> While the Act adopts a "compelling governmental interest" standard, . . .
> "[c]ontext matters" in the application of that standard. . . .  Lawmakers supporting
> RLUIPA were mindful of the urgency of discipline order, safety, and security in
> penal institutions. . . . They anticipated that courts would apply the Act's standard
> with due deference to the experience and expertise of prison and jail
> administrators in establishing necessary regulations and procedures to maintain
> good order, security and discipline consistent with consideration of costs and
> limited resources.

Cutter v. Wilkinson, 544 U.S. 709, 722-23 (2005) (internal quotation, citations, and footnote

omitted).  Additionally, the Court expressly stated that "prison security is a compelling state

interest" and "deference is due to institutional officials' expertise in this area."  Id. at 725 n.13.

---

[6]  Although I assume for the purposes of this motion that the prohibition on allowing The
Satanic Bible into the prison substantially burdens plaintiff's rights, I note that other than
expressing an interest in obtaining a copy of The Satanic Bible, plaintiff fails to show that the
lack of access to the book burdens his practice of Satanism in a substantial way and thus, he fails
to create an issue of fact on the initial element of his RLUIPA claim.  See Warsoldier, 418 F.3d
at 995 (a "substantial burden on religious exercise must impose a significantly great restriction or
onus upon such exercise") (internal quotation omitted).

Based on the discussion in the preceding section regarding plaintiff's free exercise claim, it is clear that The Satanic Bible is justifiably considered by prison officials, to whose expertise I defer, to create serious security and safety risks within the prison, for inmates and prison staff. As a result, defendants establish the required compelling state interest. Additionally, preventing access to the book is the least restrictive means to meet that interest because it is the material contained in the book itself that creates the risks and there is no lesser restrictive means to prevent the book from entering the prison.

I grant summary judgment to defendants on the RLUIPA claim.

III.  Trust Account Claim

In his Fourth Amended Complaint, plaintiff alleges that defendant Williams knowingly and illegally fined plaintiff $4,700 for disciplinary infractions, for $225 in property damages, and $300 for medical advancements. Fourth Am. Compl. at p. 18. He alleges that Williams lacks authority to excessively fine an indigent inmate and that the ODOC hearings officers are not judges sitting in a "courthouse of competent jurisdiction." Id. He contends that he has a property interest in $42.54 that was taken from his inmate trust absent account judicial authorization for the fine. Id.

Other than submitting a printout of misconduct reports issued to plaintiff from October 2000 to April 2008 and which show the impositions of various disciplinary fines, plaintiff fails to identify when these deductions occurred. To the extent they occurred more than two years before he filed this action on November 5, 2007, any claim based on such deductions is time barred. Sain v. City of Bend, 309 F.3d 1134, 1139 (9th Cir. 2002) (appropriate statute of limitations for

20 - OPINION & ORDER

section 1983 actions in Oregon is two years).[7]

Management of inmate trust accounts are governed by OAR 291-158-0005 - 291-158-0075.  ODOC Central Trust Accounting establishes one trust account for each inmate.  Hawks Decl. at ¶ 6; OAR 291-158-0015(1).  ODOC may assess an inmate's trust account for certain specified expenses including sanctions resulting from a disciplinary hearing, damages or destruction caused by willful misconduct, and medically required services.  OAR 291-258-0015(1).

Dick Hawks, Manager of ODOC Central Trust, states that when plaintiff was most recently admitted to the custody of ODOC on January 4, 2007, his debt from prior incarcerations remained on his inmate trust account.  Hawks Decl. at ¶ 8.  Any debt incurred since his January 2007 admission has also been assessed to his inmate trust account.  Id.  Presently, plaintiff is indebted to ODOC for $5,037.46 in disciplinary fines, $192.50 in medical advances, and $245.56 in restitution for property damage.  Id. at ¶ 9; see also Att. 3 to Hawks Decl (plaintiff's Trust Account Summary).  According to Hawks, the disciplinary fines and restitution for property damage are assessments made to the trust account by an ODOC Hearings Officer following the disciplinary process.  Id. The medical advances are approved through Health Services.  Id.

ODOC rules addressing prohibited inmate conduct and the processing of disciplinary actions are found at OAR 291-105-0005 - 291-105-0100.  These rules govern the handling of misconduct by inmates including the issuance of a written report to the inmate, a hearing, and a written order making findings of fact and conclusions of law.  See OAR 291-105-0021, 291-105-

---

[7] Thus, the specific claim to $42.84 is not actionable because the undisputed evidence in the record is that this deduction occurred in 2001.  Hawks Decl. at ¶ 10.

0026, 291-105-0028, 291-105-0031.  The available sanctions for disciplinary violations are

outlined in OAR 291-105-0066.  Plaintiff submits no evidence whatsoever indicating that the

disciplinary fines and property damage expenses he challenges here were imposed in any fashion

other than as provided for in the OARs.[8]

    In his response memorandum, plaintiff focuses his argument on the imposition of

disciplinary fines.  Specifically, he contends that the deduction of these fines violates his rights to

due process and the "taking clause" of the Eighth Amendment.[9]  Pltf's Mem. at p. 5.  He generally

states that a hearing officer must afford due process to the inmate and that upon a finding of

"guilty" of a disciplinary charge, the inmate is entitled to a written statement by the factfinder of

the evidence relied upon, and the right to appeal.  Id. at p. 6.  He contends that imposing a

disciplinary fine on an indigent inmate violates due process and that defendants cannot collect a

disciplinary fine unless that fine is approved or finalized by a court.  Id. at p. 7.  He suggests that

various sanctions including loss of privileges or loss of "earn time credit," as well as a $200 fine

for "disrespect" are unconstitutionally excessive in violation of the Eighth Amendment.  Id. at p.

8.

_____

    [8] Although in his Fourth Amended Complaint plaintiff mentions deductions for medical
advancements, he fails to mention these deductions in his opposition memorandum, suggesting
he has abandoned that part of the claim.  In any event, he submits no evidence indicating that the
medical advancement deductions were not authorized by Health Services or were not for
medical-related expenses.  Thus, defendants are entitled to summary judgment on this portion of
his inmate trust account claim.

    [9] It is unclear if plaintiff meant to refer to the takings clause of the Fifth Amendment, or
to the excessive fine clause of the Eighth Amendment.  To the extent he raises a takings clause
claim, it has no merit.  See Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146,
157 (1919) (takings clause applies to situations where the government appropriates private
property for public use pursuant to its regulatory powers and does not apply when the
government imposes penalties or forfeitures in an exercise of its police power).

22 - OPINION & ORDER

Several decisions from this Court have already rejected similar claims.  See, e.g., Steffler v. Williams, No. CV-09-16-KI, 2010 WL 3122853, at *2 (D. Or. Aug. 9, 2010) (the due process an inmate receives in his disciplinary hearing assessing the fine, along with the general statute giving ODOC the ability to enforce the rules of the prison, and the administrative rules concerning the disciplinary procedure, are sufficient due process for defendants to collect the fine from the inmate's trust account); Barrett v. Williams, No. CV-06-1045-JE, 2007 WL 1598158, at *3-4 (D. Or. May 30, 2007) (upholding imposition of disciplinary fines under the Eighth Amendment and the Due Process Clause, despite the failure to take into account an inmate's indigent status); Grimes v. ODOC Agency, No. CV-06-619-AS, 2007 WL 1170636 (D. Or. Apr. 11, 2007) (rejecting plaintiff's claims that disciplinary fines violated Fifth Amendment takings clause, Eighth Amendment's prohibition on excessive fines, and Due Process Clause).

Here, plaintiff brings forth no facts to support his claims.  He fails to challenge any specific fine and fails to present any evidence allowing the court to review the process afforded to plaintiff in regard to any particular sanction.  As noted above, he fails to show that the applicable OARs regarding the disciplinary process were not followed.  Accordingly, plaintiff fails to create an issue of fact showing that he is entitled to relief on his inmate trust account claim, regardless of the constitutional provision he alleges was violated.  I grant summary judgment to defendants on the inmate trust account claim.

IV.  Remaining Issues

In response to the summary judgment motion, plaintiff appears to raise a First Amendment retaliation claim which was not a claim brought in the Fourth Amended Complaint, and to re-raise claims related to his conditions of his confinement which Judge King previously

dismissed.  Because these claims have been dismissed or were not properly raised in the operative pleading, I do not consider them.

Because I find that defendants are entitled to summary judgment on the merits of plaintiff's claims, I do not consider defendants' argument regarding plaintiff's failure to show personal involvement of the named defendants in the alleged actions, or defendants' argument regarding qualified immunity.   I also do not consider plaintiff's argument regarding supervisory liability by policymakers.

Finally, when defendants moved for summary judgment, they filed a separate motion to allow them to submit two documents in camera.  The first is an attachment to the Webb Declaration and the second is a Supplemental Declaration of Gary Sims.  Defendants represent that the documents contain information that is a threat to the safe and secure operation of a correctional facility and also to ODOC corrections staff and inmates.  Because ODOC inmates are prohibited from possessing the subject matter of these documents, defendants contend they should not be viewed by plaintiff.

Plaintiff filed no opposition to the motion to submit the documents in camera. Nonetheless, I deny the motion as moot because, in resolving the summary judgment motion, I did not to rely on the documents defendants sought to file in camera

/ / /

/ / /

/ / /

/ / /

/ / /

24 - OPINION & ORDER

CONCLUSION

Defendants' motion for summary judgment [107] is granted.  Defendants' motion to allow

the filing of in camera documents [112] is denied as moot.

IT IS SO ORDERED.

Dated this __22nd___ day of __December_____, 2011

_/s/ Marco A. Hernandez_____
Marco A. Hernandez
United States District Judge

25 - OPINION & ORDER